1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| DOS BEACHES, LLC and MELINDA M. RAYTER, | CASE NO. 09CV2401-LAB (RBB) |
| Plaintiff, | **ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| vs. | |
| MAIL BOXES ETC., INC. and UNITED PARCEL SERVICE, INC., | |
| Defendants. | |

12
13
14
15
16
17

## I.    Introduction

18        Through her LLC, Dos Beaches, Melinda Rayter opened a franchise of The UPS Store

19   in Indiana.  The UPS Store is actually franchised by Mail Boxes Etc., itself a subsidiary of

20   UPS.  The core of Rayter's complaint is that Defendants breached the Franchise Agreement

21   that she signed in September 2004, prior to opening her franchise of The UPS Store.[1]

22        The Court dismissed Rayter's original complaint, without prejudice, because it was

23   simply too unwieldy to even consider.  It explained:

24            The problem with Dos Beaches' complaint ought to be plain to
             any reader.  At 30 pages and over 300 paragraphs, it reads as
25            a running commentary of grievances rather than a thoughtful

26   _____

27        [1] The Court will refer to Plaintiff as "Rayter" and Defendants as "Defendants."  This
     does not mean that the Court rejects Defendants' argument that Rayter cannot bring this
28   case personally and that UPS cannot be sued.  Those arguments will be addressed at the
     end of this Order.

> account of what precisely the Defendants did that entitles Dos Beaches to legal relief.  The main cause of action for breach of contract only exacerbates this problem.  Not only does it allege new facts that don't appear in the body of the complaint, it contains, on the Court's count, *twelve* distinct grievances, only some of which have an alleged basis in contracts entered into by the parties . . . .

> Neither Mail Boxes Etc. nor the Court should have to cull through Dos Beaches' complaint and attach factual allegations to legal claims.  The complaint should come pre-assembled, stating as succinctly as possible the facts giving rise to the claims and then the claims themselves, with reference back to the underlying facts.  Frankly, the complaint appears to be the product of Dos Beaches' counsel simply downloading into a pleading form notes from client interviews, taking little time to condense, polish, and strategically arrange them.  It is imperative that Dos Beaches do more than paint a sinister picture of Mail Boxes Etc. and its various alleged agents; it is imperative that Dos Beaches offer a short and succinct statement of the facts *relevant* to her claims, followed by a short and succinct statement of those claims themselves.

(Dkt. No. 23 at 2–4.)   Now pending before the Court is Defendants' motion to dismiss

Rayter's First Amended Complaint.

## II.    Legal Standard

A 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency

of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In considering such a

motion, the Court accepts all allegations of material fact as true and construes them in the

light most favorable to Rayter.  *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of

U.S.*, 497 F.3d 972, 975 (9th Cir. 2007).  To defeat a 12(b)(6) motion, a complaint's factual

allegations needn't be detailed; they must simply be sufficient to "raise a right to relief above

the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However,

"some threshold of plausibility must be crossed at the outset" before a case can go forward.

*Id.* at 558 (internal quotations omitted).  A claim has "facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. ----, 129 S.Ct.

1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but

it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

While the Court must draw all reasonable inferences in Rayter's favor, it need not

"necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotations omitted).  In fact, the Court does not need to accept any legal conclusions as true. *Iqbal*, 129 S.Ct. at 1949.  A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations omitted). Nor does it suffice if it contains a merely formulaic recitation of the elements of a cause of action. *Bell Atl. Corp.*, 550 U.S. at 555.

**III.     Requests for Judicial Notice**

Defendants have asked the Court to take judicial notice of the Franchise Agreement and an exhibit to the Uniform Franchise Offering Circular that Rayter received before she executed the Franchise Agreement.  Both of these documents are specifically referenced in Rayter's complaint, and Rayter does not object to the Court taking judicial notice of them. In fact, Rayter's and the Defendants' arguments rely equally upon the documents. The Court therefore takes judicial notice of the documents.  Defendants' request is **GRANTED**. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or document forms the basis of the plaintiff's claim.").

Rayter has asked the Court to also take judicial notice of the Defendants' websites and their contents pursuant to Fed. R. Ev. 201, which allows for courts to take notice of facts "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Rule 201 only pertains to *adjudicative* facts—those facts that are "simply the facts of the particular case." *See* Rule 201, 1972 Advisory Committee notes. "They are the facts that normally go to the jury in a jury case.  They relate to the parties, their activities, their properties, their businesses." *Id.* (quoting 2 Administrative Law Treatise 353).  The Court finds that the website contents are not "the facts of this case," and therefore not the kind of adjudicative facts of which it can take notice.  Nowhere in Rayter's complaint does she mention the Defendants' websites or their contents, which means that, as stated, her

claims do not rely upon them and they are not noticeable.  *See Ritchie*, 342 F.3d at 908; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (holding that "documents whose contents are alleged in a complaint . . . may be considered in ruling on a Rule 12(b)(6) motion to dismiss").  The websites are mentioned for the first time in her opposition brief, and even then only in their *current* form, not their form at the time that her claims allegedly arose.  Finally, as Defendants point out, the timing of Rayter's request for judicial notice—*after* Defendants filed their reply brief—is suspicious.  The request is therefore **DENIED**.

## IV.    Discussion

Rayter's complaint is leaner this time around, but it still has problems.  The biggest is that the complaint still lacks the kind of narrative structure that makes it clear just what happened in this case and why Rayter believes she was wronged.  It appears that every last grievance she has with Defendants has made its way into her First Amended Complaint, irrespective of its connection to a particular cause of action.

### A.    Breach of Contract

Rayter's most substantial claim against Defendants is that they breached the Franchise Agreement, which she executed on behalf of Dos Beaches on September 7, 2004, in a number of ways.  Below, the Court will identify and name each of them, and then consider whether Rayter has alleged adequate facts with respect to each.

- The Franchise Agreement allowed Rayter to choose the location of her UPS Store franchise.  Defendants, however, did not allow her to do so.  Rayter does not identify a section of the Franchise Agreement that made this allowance, and her complaint implies this was actually an oral representation made to her by Defendants, rather than an explicit term of the Franchise Agreement itself. (Compl. ¶ 56.) **("Choice of Location Claim")**

- The Franchise Agreement allowed Rayter, indeed *recommended* that Rayter, retain her own attorney or real estate broker to negotiate a commercial lease.  Defendants, however, did not allow her to do so. (Compl. ¶ 57.) **("Attorney and Broker Claim")**

- The Franchise Agreement gave Rayter the right to make use of "The UPS Store" logo on her storefront.  Defendants, however, determined the location of her store, and then negotiated a lease that did not allow for

- 4 -

09CV2401

her to display "The UPS Store" on the outside of the location.  (Compl. ¶¶ 58–61.) **("Logo Claim")**

• The Franchise Agreement, § 3.3, stipulated that Defendants would provide a "Center Design."  Rayter alleges they did not properly do this.  (Compl. ¶ 62.) **("Center Design Claim")**

• The Franchise Agreement, § 3.4, stipulated that Defendants would provide "Center Development Coordination," whatever that is.  Again, Rayter alleges they did not properly do this.  (Compl. ¶ 63.) **("Center Development Coordination Claim")**

• The Franchise Agreement, § 3.5, stipulated that Rayter would be allowed to employ her own architects and contractors, but Defendants did not allow her to do so.  (Compl. ¶ 64.)   This same allowance was made, according to Rayter, in Exhibit 11 to Defendants' Offering Circular, which was incorporated into the Franchise Agreement. (Compl. ¶ 65.) **("Architect and Contractor Claim")**

• Under the Franchise Agreement, § 2.1, the term of the Franchise is ten years.  Rayter alleges Defendants violated this term by simply telling her during her first year in business that she would have to relocate her franchise at the expiration of the five-year term of her lease.  (Compl. ¶ 68.) **("Agreement Term Claim")**

• The Franchise Agreement provided that the Area Franchise Manager would coordinate a Grand Opening, but he or she failed to do so.  (Compl. ¶ 69.)  Actually, Rayter merely alleges that the Grand Opening was "supposed to be coordinated" by the Area Manager, not that the Franchise Agreement promised it would be.  She does not specify a particular term of the Franchise Agreement that was violated here.  **("Grand Opening Claim")**

• The Franchise Agreement provided that Defendants would supply Rayter with certain marketing materials, and they did not do so.  Here again, Rayter does not identify the relevant term of the Franchise Agreement, or the basis in the Franchise Agreement for the alleged obligation.  (Compl. ¶ 70.)  Rayter also alleges that the marketing materials she did receive were inadequate were inferior to those received by other franchisees, but she doesn't explain how or why this violated the Franchise Agreement.  **("Marketing Materials Claim")**

• Defendants allowed a competitor, Max Molinaro, to relocate his franchise within the territory of Rayter's customer base and "improperly favored" Molinaro.  (Compl. ¶ 72.)  Rayter does not identify the term of the Franchise Agreement that gives her exclusive rights to

- 5 -

09CV2401

operate a franchise in a given area, nor does she identify the term that precludes the kind of favoritism she alleges. **("Molinaro Claim")**

- Defendants interfered with Rayter's relationship with the landlord. (Compl. ¶ 66.)  While Rayter alleges that Defendants had no positive right under the Franchise Agreement to interfere with the franchisee/landlord relationship, she does not explain how such interference actually violated the Franchise Agreement. **("Landlord Interference Claim")**

- Defendants provided Max Molinaro with Rayter's confidential operational and financial information. (Compl. ¶ 73.) Rayter alleges that there is no provision in the Franchise Agreement that entitled them to do this, but she does not allege that the Franchise Agreement *prohibits* such disclosure. **("Confidentiality Claim")**

- Defendants refused to allow Rayter to relocate her franchise before she was called to active duty military service on September 18, 2009. (Compl. ¶ 74.)  Rayter does not allege that Defendants were duty-bound, under the Franchise Agreement, to approve the relocation she requested. **("Relocation Claim")**

### 1.    Choice of Location Claim

This claim is a peculiar one.  The Franchise Agreement itself, executed by Rayter on September 7, 2004 and Defendants on September 29, 2004, provided the location of Rayter's franchise *on the first page*: 341 East 81st Street, Merrillville, IN, 46410.  (FA at 1.) The Franchise Agreement later provides "The location of Franchisee's Center, set forth on page one of this Agreement, has been accepted by MBE . . . .   Upon MBE's acceptance of such proposed location, such location shall be deemed to be the 'Location', as defined herein."  (FA at 6.) The location was therefore settled even before the Franchise Agreement was a binding contract; if Rayter wasn't happy with it, as Defendants argue, she shouldn't have signed it.

In her First Amended Complaint, and in her opposition brief, Rayter had the opportunity to direct the Court to that provision of the Franchise Agreement that entitles her to choose the location of her franchise.  She hasn't done that.  She references sections 1.1, 3.1, and 3.5 in her opposition brief, but none of those sections, as the Court reads them, invest her with the right to choose the best location for her franchise.  And then Rayter

argues that "[o]nce Defendants decided where Plaintiffs' franchise was to be located, Defendants waived any provision of the franchise agreement that might act to protect them. The order of who signed the franchise agreement at what time does not change Defendants' actions and the effect of them." (Opp'n Br. at 4.) Frankly, it is not clear to the Court what Rayter even means here. She has simply failed to allege adequate facts to support a breach of contract claim based on Defendants' alleged unwillingness to allow her to choose the location of her franchise.

## 2.   Attorney and Broker Claim

This claim is also peculiar, for the same reason as the Choice of Location claim. Rayter signed a lease on September 7, 2004. (FA at Ex. I.) This was before Defendants signed the Franchise Agreement and it became a binding contract. Indeed, the language Rayter relies on is not even found in the Franchise Agreement, but in an Offering Circular provided to her that detailed the risk factors associated with opening a franchise of The UPS Store in the first place. That Offering Circular (which Rayter identified in her complaint only as "[o]ne of the documents that Defendants provided to Plaintiffs to induce the purchase of the franchise") explained:

> You understand that while MBE or its Area Franchisee may assist you in selecting a site for your Center and provide input regarding the terms and conditions of the lease and may assist in negotiating the lease, the ultimate decision and final responsibility on whether to accept the site and the lease is yours . . . . You further understand that MBE recommends that you retain your own attorney, real estate broker or business advisor to negotiate the lease and explain to you any provisions of the lease that you do not understand.

(OC ¶ 3.) Rayter, aware that the Offering Circular was not included in the Franchise Agreement, asserts that it "is part of the terms, conditions and covenants of the Franchise Agreement." (Compl. ¶ 57.) She runs into the same problem, though, as with her Choice of Location claim: Defendants' conduct *before* the Franchise Agreement was even a binding contract cannot give rise to a claim that the Franchise Agreement itself was breached. If Rayter was unhappy with the lease agreement because she was unable to negotiate the lease herself, with the assistance of her own attorney or real estate broker, she should have

simply refused to sign the lease.  Alternatively, she could have refused to sign and present to Defendants the Franchise Agreement that incorporated the lease.  The paragraph Rayter relies on, excerpted above, is explicit that the ultimate decision whether to accept the lease was hers.

On top of this, Rayter's allegation that she was not allowed to employ her own attorney and real estate broker, and to negotiate the lease herself, is pled quite thin.  She alleges nothing more than that she wanted to do the above and Defendants did not allow her to.  (*See* Compl. ¶¶ 29, 31, 32.)  She does not explain how this wish was communicated  or, for that matter, how it was rejected, leaving the Court and Defendants with little other than the conclusory allegation that Defendants breached a term of the Franchise Agreement.  It's no rebuttal, at all, to say that because her original complaint contained "too many details" her First Amended complaint cannot be criticized for containing too few.  (Opp'n Br. at 5.)  The problem with Rayter's original complaint wasn't just its volume; it also lacked organization and contained many factual allegations that were ostensibly not relevant to any of her claims.  There is nothing that excuses Rayter's failure, now, to allege actual facts that explain how exactly she was denied the opportunity to have her own attorney or real estate broker negotiate a lease on her behalf.

For these reasons, the Court finds that Rayter's breach of contract claim cannot be based upon Defendants' alleged unwillingness to permit Rayter to retain her own attorney and real estate broker.

### 3.    Logo Claim

The Franchise Agreement gave Rayter "the right and license during the Term [of the franchise] to use and display the Marks."  (FA at 2.)  Once again, with very little factual support, Rayter alleges that Defendants breached this term of the Franchise Agreement.  Rayter's allegation appears to be that when Defendants negotiated the lease for the location of her franchise, they "failed to secure permission for the placement of the UPS Shield/logo on the outside of the store."  (Compl. ¶¶ 32.)  Later in her complaint, the allegation isn't that Defendants simply failed to secure permission for the logo display, but that they negotiated

1   a lease that "did not permit Plaintiffs to display or be associated with the UPS Shield/logo on

2   the outside of the store."  (Compl. ¶ 58.)  Rayter does not explain how exactly the lease

3   prohibited the logo display in the manner that she preferred.

4          The Court has already determined, however, that Rayter signed the lease before the

5   Franchise Agreement was accepted and became binding.  It therefore can't be a breach of

6   the Franchise Agreement that the lease — which the Offering Circular explained was

7   ultimately Rayter's to accept — in some sense obstructed the exercise of rights granted to

8   Rayter in the Franchise Agreement.  The Franchise Agreement merely granted Rayter the

9   "right and license" to "use and display" the Marks.  The mere fact that a lease she signed

10  didn't allow for the logo display she preferred does not mean that her *right* or *license* to

11  display the logo was infringed by Defendants.  It just means that she wasn't able to exercise

12  the right as fully as she hoped.  Rayter does not allege adequate facts to stake a breach of

13  contract claim on the allegation that her lease prevented her from displaying the logo of The

14  UPS Store.

15                    **4.    Center Design Claim**

16         Rayter alleges that the "Center Design" promised in the Franchise Agreement "was

17  not properly done."  (Compl. ¶¶ 34, 62.)  She does not allege any facts that add substance

18  to this bare allegation.  She does not allege, for example, that she received *no* Center

19  Design, nor does she allege why the Center Design that was provided to her was improper.

20  This is precisely the kind of allegation that cannot withstand a motion to dismiss.

21         The Franchise Agreement says this about a Center Design:

22                 Upon receipt from Area Franchisee or Franchisee, or other
               designated party as applicable, of completed pre-construction
23             forms and as-built drawings of the Location, MBE shall provide
               to Franchisee a Center design for the Location containing MBE's
24             design requirements, including building specifications (locations
               of walls, counters, retail displays, fixtures, and equipment) (the
25             "Center Design").

26  (FA at 7.)  In her opposition brief, Rayter fails again to explain how Defendants violated this

27  term.  She offers only the conclusory statement that "pursuant to FA § 3.3, MBE promised

28  to provide a Center Design and breached that obligation."  (Opp'n Br. at 6.)  Rayter must

plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.  She does not do that.  She offers only legal conclusions — Defendants breached the a term of the Franchise Agreement — that take the form of a factual allegation.  This is simply inadequate.  *See Warren*, 328 F.3d at 1139.

### 5.    Center Development Coordination Claim

Section 3.4 of the Franchise Agreement addresses "Center Development Coordination."  It says:

> Area Franchisee, or if none, MBE's Designee, if any, shall supervise and coordinate construction at the Center at the Location (the "Center Development Coordination Services"), including the initial construction of the Center (as provided in Section 3.5), remodels, relocations, conversions, Kiosks and image upgrades.

(FA at 7.)  Once again, Rayter's allegations in her complaint are entirely conclusory.  She simply says that the Center Development Coordination "was not properly done."  (Compl. ¶¶ 34, 63.)  She alleges no facts that support this allegation, or that even explain what she believes was improper about the Center Development Coordination.  Her opposition brief sheds no additional light.  (*See* Opp'n Br. at 6.)  (The Court is not even sure the Franchise Agreement places this burden on Defendants.  It says that the *Area Franchisee* shall coordinate and supervise construction, and that a designee of Defendants will do so only if there is no Area Franchisee.  An Area Franchisee is defined on page 43 of the Franchise Agreement, and it is distinct from Defendants.)

The Court finds insufficient factual support in Rayter's pleadings for a breach of contract claim premised upon Defendants' alleged failure to provide Center Development Coordination.

### 6.    Architect and Contractor Claim

Rayter alleges in her complaint, in three places, that Defendants would not permit her to employ her own architects and contractors to build out her franchise of The UPS Store.  As with her Center Design Claim and Center Development Coordination Claim, the allegation is completely vague and devoid of factual support:

09CV2401

> Defendants . . . would not permit Plaintiffs to retain their own real estate broker, architect or contractors for services connected with Plaintiffs' franchise . . . . (Compl. ¶ 29.)

> The contractor mandated by Defendants and/or their agents did work that was improper, caused substantial delays and losses to Plaintiffs, and demanded improper payments from Plaintiffs. (Compl. ¶ 35.)

> § 3.5 of the Franchise Agreement states that MBE will allow franchisees to employ their own licensed architects and contractors.  In Breach of the Agreement, Defendants did not allow Plaintiffs to employ their own licensed architects and contractors . . . ." (Compl. ¶ 64.)

> Pursuant to FA § 3.5, Plaintiffs had the right to employ their own licensed architects and general contractors.  MBE did not allow Plaintiffs to do this.  (Opp'n Br. at 6.)

According to Rayter, this was a violation of the Franchise Agreement's term that

> [u]pon receipt by Area Franchisee and MBE of the Center Design, Franchisee shall at its sole cost and expense promptly cause the Center to be constructed, equipped and improved in accordance with the Center Design, unless MBE shall, in writing, consent to modifications thereof.  Franchisee shall employ licensed architects and general contractors of its own selection, and accepted by MBE, and at its sole cost and expense, to prepare such architectural, engineering and construction drawings and site plans as necessary to supplement the Center Design in order to obtain all permits required to construct, remodel, renovate, and/or equip the Center at the Location.

(FA at 7.)  Defendants take Rayter to task for failing to specifically allege that she actually proposed her own architects and contractors, and that they were rejected by Defendants. Moreover, a close reading of the term reveals that Rayter had no freestanding right to use her own architects and contractors.  Rather, the Franchise Agreement places the burden on Rayter to select architects and contractors, who must then be *accepted* by Defendants.  If Rayter actually proposed identifiable architects and contractors to Defendants, she could simply have alleged that in her complaint.  She didn't.  Even in her opposition brief, the most she says in response to Defendants' argument that she never proposed any architects or contractors is, "Not only is this statement untrue, but based on Defendants refusal to allow Plaintiffs' to use their own professionals no proposal was possible."  First, if the statement is untrue, Rayter should easily be able to allege facts that give rise to the inference that it is untrue.  Second, if Rayter is actually alleging that it was impossible to make a proposal, she

09CV2401

1  is conceding that she never made one.

2       The Court finds that Rayter has failed to allege adequate facts here.  In the first place,

3  she misconstrues the Franchise Agreement, which requires her to use architects and

4  contractors of her own selection *provided* they are accepted by Defendants. That "provided,"

5  is critical, because it undercuts Rayter's assumption that she had some absolute right to

6  select architects and contractors.   And in the face of Defendants' argument that Rayter

7  hasn't alleged that she ever proposed her own architects and contractors, Rayter hasn't

8  offered a single factual allegation to the contrary.  She merely repeats the incomplete charge

9  that Defendants forced a contractor on her.  (*See* Opp'n Br. at 7.)  The Court finds this

10  insufficient to support her argument that Defendants breached § 3.5 of the Franchise

11  Agreement.

12                  **7.   Agreement Term Claim**

13       According to Rayter, Defendants told her she'd have to relocate her franchise when

14  her lease was set to expire, at the five-year mark of a ten-year franchise term:

15            Pursuant to paragraph 2.1 of the Franchise Agreement, the term
          of the franchise is ten years.   In breach of the Franchise
16            Agreement, Plaintiffs were told by Defendants and/or their
          agents during their very first year in business that Plaintiffs would
17            have to move their Store to a different location at the expiration
          of the five-year term of Plaintiffs' lease, which would require that
18            Plaintiffs would improperly incur another set of build out costs.

19  (Compl. ¶ 68.)  Defendants address this argument only in passing in their motion to dismiss.

20  (Br. at 13–14.)  Rayter, for her part, doesn't address it at all in her opposition brief, so it may

21  be the case that she regards it as non-essential or subsumed by one of the other claims.

22       In any event, the Court is perplexed by the Agreement Term Claim.  First, one of

23  Rayter's core grievances it that she *wanted* to relocate her franchise and was forbidden from

24  doing so.  Here, Rayter appears to be alleging almost the opposite: she wanted to stay put

25  and Defendants forced her to relocate.  Second, assuming Defendants did tell Rayter she'd

26  have to relocate at the five-year mark, this doesn't mean they cut the *term* of her franchise

27  short.  Third, Rayter points to no provision in the Franchise Agreement that imposes upon

28  Defendants a duty to respect the initial location of Rayter's franchise and leave it be for the

entire franchise term.  The Court finds that the Agreement Term Claim is inadequately pled and cannot sustain Rayter's claim that Defendants breached the Franchise Agreement.

### 8.    Grand Opening Claim

As noted above, Rayter does not identify any provision of the Franchise Agreement that promises the Area Franchise Manager will coordinate a Grand Opening.  (*See* Compl. ¶¶ 38, 69.)  Defendants raise this very point in their motion to dismiss, and Rayter's response in her opposition brief is completely unsatisfying:

> As to the Grand Opening coordination, Defendants required Plaintiffs to pay $7,500 for this service, and then it was not properly done. Defendants accepted this payment for work to be performed pursuant to the Franchise Agreement.  It was therefore contractually bound to properly perform, which it did not.  Even if this were to be determined not to be a breach of the Franchise Agreement, it was a breach of an ancillary agreement.

(Opp'n Br. at 7.)  Not only does Rayter again fail to identify where in Franchise Agreement Defendants were bound to coordinate a Grand Opening, she alleges no specific facts to support the allegation that "it was not properly done."  Nor does she explain what the nature or source of the so-called "ancillary agreement" might be.  Rayter has therefore failed to state adequate facts to support a breach of contract claim here.

### 9.    Marketing Materials Claim

Rayter's Marketing Materials Claim merits the exact same analysis as her Grand Opening Claim.  Twice in her complaint she vaguely alleges that she was not provided marketing materials to which she was entitled.  (*See* Compl. ¶¶ 39, 70.)  She does not explain what marketing materials were withheld, nor does she reference any term of the Franchise Agreement that entitled her to marketing materials.  Defendants argue that, for this reason, the allegation fails to state a claim.  (Br. at 12.)

Rayter hardly responds.  She says that "Defendants' breach of contract as to the marketing materials is shown by Defendants' failure to comply with the Franchise Agreement," and then she references § 8 of the Franchise Agreement, titled "Advertising and Marketing," with no additional explanation.  (Opp'n Br. at 7.)  She also attempts to justify the paucity of details by insinuating that when she provided numerous details in her original

09CV2401

complaint, Defendants and the Court complained that she provided too many.  Neither attempt to save her Marketing Materials Claim is persuasive.  If the Franchise Agreement promised Rayter that she would receive particular marketing materials, it shouldn't be hard to point to specific language in the Agreement and then allege a fact or two that gives rise to the reasonable inference that this promise was broken.  The Marketing Materials Claim cannot be the basis of a breach of contract claim.

### 10.    Molinaro Claim

It's clear enough to the Court that Rayter believes Defendants breached the Franchise Agreement by allowing Max Molinaro to open a franchise of The UPS Store very close to Rayter's franchise.  The implication here is that the Franchise Agreement promised Rayter an exclusive license to operate her franchise of The UPS Store within a certain geographic area, as is probably a common provision in franchise agreements:

> Plaintiffs informed Defendants' agent, Susan Scott from Defendants' Area Franchise Office, that another Franchisee, Max Molinaro's, proposed relocation of one of his stores to a location directly south of the Plaintiffs store would have devastating effects upon the Plaintiffs' ability to maintain their customer base.  Despite this knowledge, Defendants allowed franchisee Max Molinaro to establish a store in this location.  In breach of the Franchise Agreement, Defendants improperly favored franchisee Max Molinaro over Plaintiffs.

(Compl. ¶ 72.)  Defendants mention this claim in their motion to dismiss, but, as far as the Court can tell, they skip over it in their actual analysis and construe it as part of Rayter's Relocation Claim.  (*See* Br. at 12–13.)  Rayter also doesn't reiterate or pursue the claim it in her opposition brief.

The Court is therefore left only with the naked assertion above.  Because Rayter fails to identify a single term in the Franchise Agreement that Defendants violated by allowing Molinaro's franchise to operate in close proximity to hers, the Court finds no basis for a breach of contract claim based upon the Molinaro Claim.

### 11.    Landlord Interference Claim

Rayter's Landlord Interference Claim, like her Molinaro Claim, is only addressed by Defendants in passing and has not been specifically pursued by Rayter in her opposition

brief, where she merges it with her Agreement Term Claim.  (*See* Opp'n Br. at 7.)

Rayter fails to allege particulars as to how Defendants interfered with her franchisee/landlord relationship in her complaint.  (*See* Compl. ¶¶ 36, 66.)  She does not improve upon her allegations in her opposition brief, in which she simply asserts that "Defendants' interference with Plaintiff and their landlord caused Plaintiffs to have to move the location of their store . . . . This constituted a breach of contract on the part of Defendants since Defendants did not allow Plaintiffs to obtain the benefit of their bargain in the Franchise Agreement."  (Opp'n Br. at 8.)  Still, there is no indication what term of the Franchise Agreement Rayter believes Defendants violated, and therefore no basis for a breach of contract claim.  If Rayter's argument is that the Franchise Agreement doesn't authorize Defendants to interact with her landlord, then Defendants are absolutely right: they cannot be accused of breaching a contract simply for having done something the contract doesn't explicitly authorize them to do.

### 12.   Confidentiality Claim

In two places in her complaint, Rayter alleges that Defendants provided her confidential franchise information to Molinaro, a competitor:

> Defendants . . . required Plaintiffs to supply confidential information to them, and Defendants then took the information they required Plaintiffs to supply and provided Plaintiffs' confidential information to Max Molinaro, which harmed Plaintiffs by allowing Mr. Molinaro to know how to thwart Plaintiffs' objectives. (Compl. ¶ 42.)

> There is no provision in the Franchise Agreement that permits Defendants to provide the confidential information of one franchisee to another franchisee.  This was done by Defendants by improperly informing Max Molinaro of all details concerning Plaintiffs' operation and finances. (Compl. ¶ 73.)

The same deficiencies with Rayter's pleadings persist.  Rayter does not allege any specifics—what was disclosed, when it was disclosed, how it was disclosed—and, more importantly, she does not identify any confidentiality term of the Franchise Agreement that was breached.  Defendants raise these problems in their motion to dismiss.  (Br. at 13.)

Rayter's comeback is that the Franchise Agreement required *her* to keep certain information confidential, and fairness dictates that the same standards should apply to

1    *Defendants.*  (*See* Opp'n Br. at 7.)  She argues: "Since Defendants required Plaintiffs to keep

2    information confidential, they created the standard to be followed."  (Opp'n Br. at 12.)  She

3    cites several Franchise Agreement provisions, all of which bind *her*.  For example, § 7.2

4    provides that Defendants will supply Rayter with certain operations manuals once the

5    Franchise Agreement is executed, and it requires that she "shall not make, or cause or allow

6    to be made, any copies, reproductions or excerpts of all or any portion of the Manuals without

7    MBE's express prior written consent."  (FA at 16.)

8         This argument is unavailing.  Section 7.2 of the Franchise Agreement, along with the

9    other sections referenced by Rayter, do not state or imply a contractually binding counter-

10   duty on the part of Defendants that prohibits them from disclosing one franchisee's

11   information to another.  The one case *Rayter* cites, *American Loan Corp. v. California*

12   *Commercial Corp.*, 211 Cal.App.2d 515 (Cal. Ct. App. 1963), concerns an implied contract

13   in the employment context that an employee will not divulge confidential information of his

14   employer gained during the course of his employment.  This case is not that one.

15                    **13.    Relocation Claim**

16        Rayter alleges that Defendants denied her permission to relocate her franchise of The

17   UPS Store, in violation of the Franchise Agreement.  (*See* Compl. ¶¶ 40, 43–45, 74.)  In the

18   face of Defendants' legitimate objection that Rayter fails to identify a term of the Franchise

19   Agreement that entitled her to relocate, Rayter alleges a violation of § 1.1: "As to Defendants

20   failure to allow the relocation of Plaintiffs' store, Defendants' actions violated paragraphs 1.1

21   of the Franchise Agreement by refusing to allow this to favor another franchisee."  (Opp'n Br.

22   at 7.)

23        Rayter cannot be right.  Section 1.1 authorizes a relocation "only with MBE's prior

24   written consent, and upon such terms and conditions as MBE may prescribe in the

25   Manuals . . . ."  (FA at 2.)  It is astonishing to the Court, quite frankly, that Rayter, aware of

26   such language, maintains that she had some kind of absolute right to relocate her franchise.

27   Without any additional facts, the raw claim that Rayter wanted to relocate and was prohibited

28   from doing so does not adequately state a claim for breach of the Franchise Agreement.

1

### 14.    Conclusion

The Court has made a considerable effort to break down Rayter's breach of contract claim into its constituent parts—into *thirteen* different breach of contract claims, really—and consider each of them.  To be blunt, the claims are poorly pled and poorly defended, and the Court finds that the factual and legal allegations underlying each fail to state a breach of contract claim.  Defendants' motion to dismiss Rayter's breach of contract claim is therefore **GRANTED**, and the claim is **DISMISSED WITH PREJUDICE**.

Because the Court finds that Rayter's allegations, in and of themselves, fail to state a claim upon which relief can be granted, it does not consider the Defendants' arguments that: (1) Rayter released Defendants from any liability resulting from their involvement in negotiating a lease (Br. at 8); (2) Rayter's claims arising out of the selection of her franchise location are time-barred (Br. at 8); (3) Rayter released Defendants from any claim based on the construction of her franchise (Br. at 11); and (4) Rayter's claims arising out of the construction of her franchise are time-barred.

### B.    Breach of Implied Covenant of Good Faith and Fair Dealing

#### 1.    Legal Standard

The covenant of good faith and fair dealing, "implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 349 (Cal. 2000).  The covenant finds particular application—although it is not limited to—"situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith."  *Carma Developers, Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 372 (Cal. 1992); *see also Locke v. Warner Bros., Inc.*, 57 Cal.App.4th 354, 363 (Cal. Ct. App. 1997)

There are two important points to be made about the scope of the covenant.  First, there needn't be a breach of a specific contract provision for the covenant of good faith and fair dealing to be breached.  "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the

09CV2401

1    contract." *Carma*, 2 Cal. 4th at 373.  In other words, the covenant of good faith and fair

2    dealing can be breached without the contract at issue being breached.  Second, the

3    covenant isn't completely untethered from the contract.  To the contrary, "[i]t is universally

4    recognized the scope of conduct prohibited by the covenant of good faith is circumscribed

5    by the purposes and express terms of the contract."  *Id.*  The covenant "cannot impose

6    substantive duties or limits on the contracting parties beyond those incorporated in the

7    specific terms of their agreement."  *Guz*, 24 Cal.4th at 349; *see also Carma*, 2 Cal.4th at 374

8    ("We are aware of no reported case in which a court has held the covenant of good faith may

9    be read to prohibit a party from doing that which is expressly permitted by agreement.  On

10   the contrary, as a general matter, implied terms should never be read to vary express

11   terms.").

12       When the Court first dismissed Rayter's claims, without prejudice, it admonished her

13   that "[n]either Mail Boxes Etc. not the Court should have to cull through Dos Beaches'

14   complaint and attach factual allegations to legal claims.  The complaint should come pre-

15   assembled, stating as succinctly as possible the facts giving rise to the claims and then the

16   claims themselves, with reference back to the essential underlying facts." (Dkt. No. 23 at 3.)

17   Her original complaint failed to do that.  It alleged over 200 facts accusing Defendants of

18   misconduct, and then simply incorporated by reference all of them and said, "The actions and

19   inactions of Defendants breached the implied covenant of good faith and fair dealing."

20   (Original Compl. ¶ 264.)  It left Defendants and the Court with no idea as to the specific

21   conduct that allegedly breached the implied covenant of good faith and fair dealing.

22              **2.      The Basis of Rayter's Claim**

23       The Defendants and the Court still have no idea what specific conduct of the

24   Defendants is behind Rayter's claim.  Again, the claim itself just incorporates by reference

25   every single grievance against the Defendants, accompanied by the statement that implied

26   covenant was breached:

27              The actions and inactions of Defendants and/or their agents as
             stated in Facts Common to All Counts and the First Count
28              breached Defendants' implied covenant of good faith and fair
             dealing.  Such conduct by Defendants deprived Plaintiffs of the

anticipated benefits of their contract with Defendants, including the operation of a UPS Store franchise at a reasonable profit.

(Compl. ¶ 83.)  The Court considered *thirteen* different acts of Defendants that, in Rayter's mind, apparently give rise to a breach of contract claim.  It is completely unclear whether she believes that all of them, or some subset of them, also give rise to a claim for breach of the covenant of good faith and fair dealing.  There are also factual allegations against Defendant that do not make their way into her breach of contract claim, and it is unclear whether Rayter has them in mind, too, in alleging a breach of the covenant.  For example, Rayter alleges that Defendants represented her franchise would easily net a profit of $500,000 per year, when in fact she only incurred losses.  (Compl. ¶ 28.)  She alleges that Area Franchise Manager Andrew Tian threatened her with a lawsuit if she continued to complain about her franchise and the conduct of Defendants.  (Compl. ¶ 47.)  Rayter has simply failed the Court's directive to make the factual bases for each of her claims clear.  Worse, she attributes that failure to an effort to comply with the Court's previous order dismissing her claims without prejudice. The Court asked Rayter to do more than simply reduce the number of factual allegations (and pages) in her complaint; it asked her to "condense, polish, and strategically arrange" those allegations.  (Dkt. No. 23 at 3–4.)

Perhaps Rayter actually intends to base her claim for breach of the covenant of good faith and fair dealing on the very same allegations of misconduct beneath her breach of contract claim.  She says in her opposition brief, "In their First Amended Complaint, Plaintiffs provided a long and detailed list of the improper conduct of MBE/UPS in the Statement of Facts and First Cause of Action.  To comply with the Order of this Court they were not repeated in this Cause of Action, but were incorporated by reference."  (Opp'n Br. at 14.) She later references specific allegations underlying the breach of covenant claim—Defendants unwillingness to allow her to relocate the franchise; Defendants' interference with lease renegotiations; Defendants' disclosure of confidential information to a competitor—but then explains that "this list is not exhaustive and other allegations in the Amended Complaint apply to this Cause of Action and the case in general."  (Opp'n Br. at 17.)

09CV2401

### 3. Analysis

Defendants, seizing on the principle that the covenant cannot undercut express contract provisions, argue that Rayter's claim must fail because the Franchise Agreement "expressly provides that it is Plaintiffs' responsibility to select a site, negotiate a lease, hire a contractor and oversee construction." (Br. at 14.) There are a couple of problems with this argument. First, Rayter's claim isn't ostensibly limited to those grievances arising out of the site, lease, or construction of her franchise. To the contrary, Rayter implies that *every* grievance underlying her breach of contract claim also support her claim for breach of the covenant of good faith and fair dealing. Consider the Relocation Claim, for example. Here, Rayter points to a particular contractual provision that allows for relocation "only with MBE's prior written consent, and upon such terms and conditions as MBE may prescribe in the Manuals . . . ." (FA at 2.) If Rayter contends that Defendants were completely and deliberately unreasonable in considering her request for relocation, the Court can envision a credible argument that this "unfairly frustrat[ed] [Rayter's] right to receive the benefits of the agreement actually made." *Guz*, 24 Cal.4th at 349. Similarly, even if the Franchise Agreement does not expressly prohibit Defendants from allowing other franchises to operate within the immediate vicinity of Rayter, it's conceivable that this is an implied term in the Agreement and completely consistent with the spirit of it. Thus, the Molinaro Claim may be the basis of a claim that Defendants breached the implied covenant of good faith and fair dealing.

The second problem is this: Defendants are right that the covenant of good faith may not be read to prohibit a party from doing something that the contract expressly permits them to do. *See Carma*, 2 Cal.4th at 374; *Nein v. HostPro, Inc.*, 174 Cal.App.4th 833, 852 (Cal. Ct. App. 2009) (noting that "an implied covenant cannot create an obligation inconsistent with an express term of the agreement"). The converse isn't necessarily true, however. Just because the contract does not expressly prohibit a certain course of conduct does not mean the covenant of good faith and fair dealing allows it. Nor is it true, as Defendants argue, that just because a contract *addresses*—not expressly permits, but just generally *addresses*—the

conduct alleged to constitute a breach, there can be no breach.  For example, the Franchise Agreement provides that Defendants "assume[ ] no responsibility for any damages, delays, cost overruns, disputes, or otherwise regarding construction or the Construction Coordination Services performed by Area Franchisee." (FA at 7.)  The Offering Circular contains a similar waiver of liability, releasing Defendants "from any liability resulting from their efforts to assist . . . in selecting a site or negotiating a lease."  Defendants take the position that these waivers cut against "an implied obligation that MBE *would* accept responsibility for those things." (Br. at 14.)  However, there is still room for a breach of covenant claim if Rayter alleges that Defendants' involvement in the construction of her franchise location, or the negotiation of her lease, rose to such an egregious level that Defendants are guilty of undermining her ability to run a profitable franchise.  In other words, it is not inconsistent with the waivers of liability to hold Defendants accountable, nonetheless, for construction or lease-related conduct that was completely unreasonable and violated Rayter's legitimate expectation that Defendants would not consciously injure her right to receive the benefit of the Franchise Agreement.  That said, the Court expects that Rayter would have to allege and show a particularly nefarious intent on the part of the Defendants, one akin to wilfullness or deliberate indifference.

The Court is inclined, once again, to dismiss Rayter's claim without prejudice and with leave to amend, consistent with the guidance above.  The Court can't say it any more explicitly: the bases for the claim must be clear.  It is not enough to simply incorporate all previous factual allegations and assert that they support the claim.  Moreover, the claim requires *bad* faith and *un*fair dealing.  To the extent it is based upon conduct that is addressed by the waivers Defendants cite, Rayter must allege that the conduct was so ill-intentioned or mindless that she could not reasonably have expected that she was absolving Defendants of liability for it in executing the Franchise Agreement.

## C.   Violation of California Franchise Investment Law

Rayter's third cause of action alleges that Defendants violated California's Franchise Investment Law.  She alleges a violation of two provisions in particular, Cal. Corp. Code §§

31200 and 31201.  (Compl. ¶¶ 99, 100.)  The former makes it unlawful "for any person willfully to make any untrue statement of material fact in any application, notice or report filed with the commissioner . . . or willfully to omit to state in any such application, notice, or report any material fact which is required to be stated therein."  The latter makes it unlawful "for any person to offer or sell a franchise in this state by means of any written or oral communication not enumerated in Section 31200 which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading."

Unsurprisingly, Rayter's complaint doesn't identify specifically the statements that she believes give rise to claims under §§ 31200 and 31201.  With respect to § 31200, she merely says that "Defendants violated [the statute] by making an untrue statement of material fact in its UFOC."  (Compl. ¶ 99.)  With respect to § 31201, she says "Defendants violated [the statute] by making an untrue statement of a material fact or omitting a material fact to Dos Beaches."  (Compl. ¶ 100.)  It is, once again, the Court's and Defendants' job to actually match factual allegations to Rayter's claims.  What was the untrue statement in the Offering Circular?  In her complaint, Rayter alleges vaguely that she "made every effort to communicate and negotiate with Defendants and/or their agents in an effort to obtain the assistance specified in Defendants' UFOC and Franchise Agreement, which Defendants and/or their agents continued to refuse to supply."  (Compl. ¶ 48.)  More specifically, though, her Architect and Contractor claim has its source in the Offering Circular.  That document entitled Rayter to "have the construction and build-out of [her] Center done by any licensed and qualified contractor or constructor of [her] own choosing," and she alleges that she was denied this right.  (OC ¶ 4; Compl. ¶ 65.)  Additionally, the Offering Circular recommended that potential franchisees retain their own attorneys or real estate brokers to negotiate a lease, and Rayter alleges that Defendants prevented her from doing so.  (OC ¶ 3; Compl. ¶ 57.)

If the Court were to consider the substance of Rayter's claims further, it would likely find that she has failed to plead them with adequate particularity.  *See California Bagel Co.*

09CV2401

*v. American Bagel Co.*, 2000 WL 35798199 at *21 n.98 (C.D. Cal. June 7, 2000) (recognizing that § 31200 claim is governed by requirement of Fed. R. Civ. P. 9(b) that the circumstances constituting a fraud be stated with particularity). The Court needn't go that route, however, because it finds that Rayter's claims under the Franchise Investment Law are time-barred.

Section 31200 simply makes certain conduct unlawful; it does not contain a private right of action. Under § 31300, however, a person who offers or sells a franchise in violation of § 31200 "shall be liable to the franchisee . . . who may sue for damages caused thereby, and if the violation is willful, the franchisee may also sue for rescission." Cal. Corp. Code § 31300. The statute of limitations for a §31300 claim appears in § 31303: "No action shall be maintained to enforce any liability created under Section 31300 unless brought before the expiration of four years after the act or transaction constituting the violation, the expiration of one year after the discovery by the plaintiff of the fact constituting the violation . . . whichever shall first expire." Cal. Corp. Code § 31303. The Offering Circular was executed by Rayter in September of 2004. Under § 31303, that is the date of "the act or transaction constituting the violation." *See Lee v. Gen'l Nutrition Cos., Inc.*, 2001 WL 34032651 at *6 (C.D. Cal. Nov. 26, 2001) (calculating end-date for CFIL claim based upon an offering circular from the date of the offering circular). She didn't initiate this action, however, until late October of 2009, over five years later. It is therefore time-barred. Rayter's argument that she didn't learn of the claim until she consulted a lawyer is no help to her. "Once the four-year . . . period expires, a plaintiff's belated discovery of the fact constituting the violation cannot serve to extend the statute of limitations. In other words, the four-year ban in section 31303 . . . [is] absolute." *People ex rel. Dep't of Corps. v. Speedee Oil Change Systems, Inc.*, 95 Cal.App.4th 709, 727 (Cal. Ct. App. 2002).

A virtually identical analysis applies to Rayter's claim based upon § 31201 of the Franchise Investment Law. That section does not provide a private right of action. Section 31301 does: "Any person who violates Section 31201 shall be liable to any person . . . who, while relying upon such statement shall have purchased a franchise . . . ." Cal. Corp. Code § 31301. The statute of limitations for a § 31301 claim appears in § 31304; the claim must

1    be brought by the earlier of "the expiration of two years after the violation upon which it is

2    based" or "one year after the discovery by the plaintiff of the facts constituting such violation."

3    Cal. Corp. Code § 31304.  The basis of Rayter's § 31201 claim are representations allegedly

4    made *before* the Franchise Agreement was executed, in late August or early September of

5    2004.  Obviously, two years have passed since those representations were made, and

6    Rayter's claim is therefore time-barred.  As with Rayter's § 31300 claim, "[o]nce the two-year

7    . . . period expires, a plaintiff's belated discovery of the fact constituting the violation cannot

8    serve to extend the statute of limitations.  In other words, the . . . two-year limit in section

9    31304 [is] absolute."  *People ex rel. Dep't of Corps.*, 95 Cal.App.4th at 727.

10       For the above reasons, Defendants' motion to dismiss Rayter's CFIL claims is

11   **GRANTED**, and those claims are **DISMISSED WITH PREJUDICE**.

12       **D.    Violation of the Indiana Franchise Law**

13       Rayter alleges that Defendants violated § 27 of Indiana's Franchise Law, which

14   basically prohibits fraud in connection with the offer, sale, or purchase of a franchise.

15   Specifically, § 27 says:

16              It is unlawful for any person in connection with the offer, sale or
                purchase of any franchise, or in any filing made with the
17              commissioner, directly or indirectly:

18              (1) to employ any device, scheme or artifice to defraud;

19              (2) to make any untrue statements of a material fact or to omit to
                state a material fact necessary in order to make the statements
20              made, in the light of circumstances under which they were made,
                not misleading; or
21
                (3) to engage in any act which operates or would operate as a
22              fraud or deceit upon any person.

23   Ind. Code § 23-2-2.5-27.

24       Defendants attack this claim in three ways.  First, they argue that a California choice-

25   of-law provision in the Franchise Agreement is enforceable—and fatal to the claim.  Second,

26   they argue that the claim is time-barred.  Third, they argue that the claim isn't pled with the

27   requisite particularity.

28       The choice-of-law argument isn't as simple as Defendants make it out to be.  The

actual provision doesn't state that any and all disputes between the parties are to be resolved under California law.  It says simply that the *Franchise Agreement* "shall be governed and construed under and in accordance with the laws of the State of California."  (FA at 39.) Rayter's claim under § 27, arguably, has to do with Defendants' conduct before the Franchise Agreement was executed; indeed, it has to do with Defendants' conduct that led Rayter to execute the Agreement in the first place.  A federal court sitting in diversity applies the choice-of-law rules of the forum to determine the applicable substantive law.  *Fields v. Legacy Healthy Systems*, 413 F.3d 943, 950 (9th Cir. 2005).  In California, moreover, the scope of a choice-of-law provision is examined under the law designated in the provision—here, California law.  *Washington Mutual Bank, F.A. v. Superior Court*, 24 Cal.4th 906, 916 n.3 (Cal. 2001).

Some states interpret the scope of choice-of-law provisions narrowly.  For example, in *TaiMed Biologics, Inc. v. Numoda Corp.*, a court in the Northern District of California, considering a Pennsylvania choice-of-law provision, recognized that under that state's law a "narrow choice of law provision stating that a contract's terms or enforcement are to be governed, or construed, by the laws of another state are generally interpreted . . . to relate only to the construction and interpretation of the contract at issue."  2011 WL 1630041 at *4 (N.D. Cal. Apr. 29, 2011) (quoting *Grimm v. Discover Fin. Serv.*, 2008 WL 4821695 at *7 (W.D. Pa. Nov. 4, 2008)).   *See also Sarandi v. Breu*, 2009 WL 2871049 at *4 (N.D. Cal. Sept. 2, 2009) ("Under New York law, choice-of-law clauses are deemed to apply only to claims that are based on rights conferred by the agreement.").

In California, however, the scope of choice-of-law provisions is interpreted more broadly: "[A] valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationship it creates." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 470 (Cal. 1992).  *See also Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 WL 92984 at *4 (C.D. Cal. Jan. 11, 2011)

1   (noting the "broad application of choice-of-law provisions by California courts").   Taking

2   *Nedlloyd* at its word, the Court finds that Rayter's claim falls within the scope of the choice-of-

3   law provision in the Franchise Agreement.   Even if the alleged misrepresentations were

4   made before the Franchise Agreement was even a live document, Rayter's claims actually

5   arose during the course of her commercial relationship with Defendants when those

6   representations, allegedly, were not satisfied.   *See Nedlloyd*, 3 Cal.4th at 469 ("When a

7   rational businessperson enters into an agreement establishing a transaction or relationship

8   and provides that disputes arising from the agreement shall be governed by the law of an

9   identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all*

10  disputes arising out of the transaction or relationship."); *In re TFT-LCD Antitrust Litig.*, 781

11  F.Supp.2d 955, 965 (N.D. Cal. 2011) (noting that California courts do not interpret choice-of-

12  law provisions narrowly, and that they can "encompass causes of action beyond the contract

13  at issue").[2]

14        The next question is whether the provision is enforceable.   *Washington Mutual Bank*,

15  24 Cal.4th at 328 ("If the trial court finds that the . . . claims fall within the scope of a choice-

16  of-law clause, it must next evaluate the clause's enforceability . . . .").   Here, Defendants urge

17  the Court to follow the framework set forth by the California Supreme Court in *Nedlloyd*.

18  *Nedlloyd*, 3 Cal.4th at 466.   *Nedlloyd*, however, is a better fit for cases, like it, in which a court

19  in California is being asked to enforce the law of some other state or jurisdiction.   *See*

20  *Washington Mutual Bank, FA*, 24 Cal.4th at 914–15 ("When the parties have an agreement

21  that another jurisdiction's law will govern their disputes, the appropriate analysis for the trial

22  court to undertake is set forth in *Nedlloyd*.").   Indeed, applying the *Nedlloyd* standard literally

23  here would make for a confused analysis, because that standard requires courts to consider

24  _____

25        [2] The Court doesn't intend to suggest that the analysis here is simple.  To the contrary, other courts have come out differently on whether claims seemingly peripheral to a

26  commercial agreement are nonetheless within the scope of the agreement's choice of law provision.  *See, e.g., Nat'l Seating & Mobility, Inc. v. Parry*, 2011 WL 4831198 at *4 (N.D.

27  Cal. Oct. 12, 2011) (choice-of-law provision in employment agreement covered breach of contract claim but not claims for fraud, negligent misrepresentation, and breach of the implied

28  covenant of good faith and fair dealing); *Wehlage v. EmpRes Healthcare, Inc.*, 2011 WL 5172278 at *4 (N.D. Cal. Oct. 11, 2011) (alter ego theory of liability not within the scope of agreement's choice-of-law provision).

"whether the chosen state's law is contrary to a *fundamental* policy of California." *Id.* The idea that this Court would ask whether the application of California law in this case violates a fundamental policy of California is perplexing.

Rather than apply *Nedlloyd* literally, it's more useful to apply the Restatement (Second) of Conflict of Laws § 187, on which *Nedlloyd* relied. *See Wehlage* at *3; *Washington Mutual Bank*, 24 Cal.4th at 916. Under the Restatement, a choice-of-law provision is enforceable unless either

> (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (2) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2). Neither prong is satisfied here such that the Court should not enforce the California choice-of-law provision. As to the first, Defendant Mail Boxes Etc. is based in California and interacts with its franchisees nationwide from its California base. As to the second, Rayter doesn't even argue that Indiana has a materially greater interest in this case, or that applying California law would be contrary to a fundamental policy of California. To the contrary, she accepts the application of California law and merely argues that she should be able to avail herself of the protections of Indiana law, too. (Opp'n Br. at 19.) That would completely defeat the purpose of a choice-of-law provision in the first place. *See Nedlloyd*, 3 Cal.4th at 469 ("We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship."

For the above reasons, the Court finds that the California choice-of-law provision in the Franchise Agreement is enforceable, and that it forecloses Rayter's ability to also seek relief under Indiana's Franchise Law. For what it is worth, the Court would likely find that Rayter hasn't stated this claim with adequate particularity. Defendants' statute of limitations

1   argument is a tougher one, because the limitations period, unlike those for claims brought

2   under California's Franchise Investment Law, does not have an absolute, outer limit.  *See*

3   Ind. Code § 23-2-2.5-30.  Defendants' motion to dismiss Rayter's Indiana Franchise Law

4   claim is **GRANTED**, and the claim is **DISMISSED WITH PREJUDICE**.

5       **E.    Fraud**

6       Rayter's final cause of action is for fraud.  In California, there are five elements to a

7   fraud claim: "(1) a misrepresentation (false representation, concealment, or nondisclosure);

8   (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4)

9   justifiable reliance; and (5) resulting damage."  *Robinson Helicopter Co., Inc. v. Dana Corp.*,

10  34 Cal.4th 979, 990 (Cal. 2004).  Just as important, though, when fraud is alleged "a party

11  must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ.

12  P. 9(b).  How much particularity is required?  Enough, certainly, so that Defendants well

13  understand which of their acts or omissions they must defend and can do more than just

14  deny that they have done something wrong.  *Bly-Magee v. California*, 236 F.3d 1014, 1019

15  (9th Cir. 2001).  Averments of fraud must be accompanied by the who, what, when, where,

16  and how of the misconduct charged.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th

17  Cir. 2009).

18      Defendants argue that Rayter fails to comply with Rule 9, and they are right.  As with

19  her claim for breach of the covenant of good faith and fair dealing, Rayter states her fraud

20  claim by essentially incorporating every grievance against Defendants and then asserting,

21  in a conclusory manner, that each grievance involves a knowingly false material

22  representation that induced Rayter's purchase of the franchise.  In fact, in one paragraph,

23  as Defendants put it, Rayter offers "nothing more than a re-hash of the prior vague and

24  conclusory allegations that were pleaded in support of the breach contract claims."  (Br. at

25  16.)  For example, Rayter wishes to stake a fraud claim on the allegation that Defendants

26  stated she would earn a net annual profit of $500,000.  (Compl. ¶ 126.)  In the body of her

27  complaint, however, that allegation plainly fails to comply with Rule 9:

28              Defendants and/or their agents represented that the location
                selected for Plaintiffs would easily be a $500,000 UPS Store

> within a few years, which was understood to mean a store that generated a net annual profit of that amount.  Plaintiffs never earned a net annual profit and in fact only incurred losses to the date Plaintiffs were forced to close their store.

(Compl. ¶ 28.)  Rayter does not allege precisely what was said, who said it, and when it was said.  The same can be said of Rayter's attempt to incorporate her Grand Opening claim into her claim for fraud.   In the body of her complaint, she doesn't even allege a *misrepresentation* with respect to the Grand Opening claim; she simply asserts that a Grand Opening was "supposed to be coordinated" by Defendants and was not. (Compl. ¶¶ 38, 69.) But even assuming she intended to allege a misrepresentation, the allegation would again fail to comply with Rule 9.  Rayter cannot simply say that Defendants told her they would provide a grand opening and did not properly provide one.  Again, Defendants are entitled to know what was actually promised, to whom and by whom it was promised, and when it was promised.  Many of the other allegations underlying Rayter's fraud claim are inadequate for the very same reason.

As further evidence of the carelessness with which Rayter pleads fraud, she incorporates other grievances into her fraud claim that arose *after* the Franchise Agreement was executed, and that don't even involve any kind of misrepresentation.

> These false material representations included . . . Plaintiffs' improperly supplying Defendants' confidential information to Max Molinaro (another franchisee), refusing to allow Defendants to move their franchise to a location that would have been profitable, Defendants' and/or their agents' threat Plaintiffs would sued [sic] in court if of [sic] Plaintiffs reported complaints.

(Compl. ¶ 126.)  These items come at the end of a series of alleged *statements*, and Rayter throws them into the mix without giving any thought to whether they have a place in the context of a fraud allegation based upon alleged misrepresentations that she relied upon in executing the Franchise Agreement.  Obviously, Rayter can't allege that she was fraudulently induced into executing the Franchise Agreement by conduct of Defendants once the Franchise Agreement had already been executed and her business was underway.  It's one thing to raise the Molinaro Claim to support a claim for the breach of the covenant of good faith and fair dealing.  It's quite another for Rayter to say that she bought the franchise on the

09CV2401

basis of false material representations, including the threat of a lawsuit once she had already purchased the franchise and began to voice her various grievances to Defendants. That doesn't even make sense.

Rayter attempts to blame the inadequacy of the factual allegations behind her fraud claim on the Court's previous order demanding a more succinct complaint. She says, "Additional details could have been provided; however, Plaintiffs had to comply with the Order of this Court and Defendants cannot now complain that additional details have not been provided after complaining that too many details were filed in the original Complaint." This argument is not well taken. There is a way to plead claims succinctly without stripping them of essential allegations and details. Neither the Court nor Defendants are to blame for the difficulty Rayter appears to be having in satisfying rather basic pleading standards. The problem remains that she attempts to make a legal claim out of every single grievance she has with Defendants, rather than streamlining her grievances and constructing tight legal claims out of them. The Court's impression of Rayter's original complaint remains its impression of her First Amended Complaint: "Frankly, the complaint appears to be the product of Dos Beaches' counsel simply downloading into a pleading form notes from client interviews, taking little time to condense, polish, and strategically arrange them." (Dkt. No. 23 at 3.) Anyway, Rayter's fraud claim is **DISMISSED WITH PREJUDICE**.

### F.    UPS and Rayter

The final matter for the Court concerns the place of UPS and Rayter in this case. UPS argues that because it wasn't a signatory to the Franchise Agreement, it can't be held liable for its breach. (Br. at 22.) Presumably, this argument extends to liability for breach of the covenant of good faith and fair dealing, which is the only surviving claim. UPS is right. "Under California law, only a signatory to a contract may be liable for any breach." *Clemens v. American Warranty Corp.*, 193 Cal.App.3d 444, 452 (Cal. Ct. App. 1987). Rayter doesn't allege adequate facts to show that UPS was actually a party to the Franchise Agreement. At best, she offers conclusory allegations that UPS was involved with the preparation of the Franchise Agreement and with the Mail Boxes Etc.'s franchise system more generally.

1  (Compl. ¶¶ 15–17.)  UPS is therefore **DISMISSED** from this case.

2      Given that the only remaining claim is for breach of the covenant of good faith and fair

3  dealing, the Court also finds that Rayter is not a proper plaintiff.  This claim is based entirely

4  on the Franchise Agreement between Mail Boxes Etc. and Dos Beaches, and the wrong

5  alleged is a wrong to *Dos Beaches*.  *See Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635.

6   Rayter has not made it clear, anyway, what prejudice she would suffer by being removed

7  as a plaintiff in this case if she can seek all damages under the name of Dos Beaches.

8  **V.     Conclusion**

9      This case has now been simplified.  It is a case in which Dos Beaches is suing Mail

10  Boxes Etc. for a breach of the covenant of good faith and fair dealing.  Dos Beaches may file

11  an amended complaint — and this will be its final try — within two weeks of the date this

12  Order is entered.  It should be apparent to Dos Beaches that Defendants, and the Court,

13  have put more time into making sense of its claims than it has in pleading them.  That is

14  unacceptable.  Dos Beaches' first complaint was completely unwieldy, and its present

15  complaint alleges too many facts, with too little specificity, and too little connection to the

16  actual legal claims.  Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure are not that

17  hard to satisfy, and after two tries Dos Beaches has still failed to satisfy them.

18

19      **IT IS SO ORDERED**.

20  DATED:  February 15, 2012

21

22  **HONORABLE LARRY ALAN BURNS**
   United States District Judge

23

24

25

26

27

28

09CV2401